All right, Mr. Weisbrod, is that correct? Yes, thank you, Your Honor. Thank you, sir. Good morning, and may it please the court, Stephen Weisbrod for Pan Am Equities. We're here this morning because we believe the court below erred in granting the motion for summary judgment of Lexington and in denying the motion for partial summary judgment of Pan Am, and in denying in the alternative additional discovery concerning industry custom and usage. I'd like to begin by talking about the plain meaning of the policy, then move on to industry custom and usage, and finally conclude with what the court should do with any ambiguity. Under the plain language of the policy, it's important to keep in mind that this policy differs from policies that have been considered by this court and other courts before. Now, like all policies, Pan Am's covers what are known as perils, which are basically insurable risks that can cause a loss. In this policy, the policy establishes a general deductible, $100,000, and then for the specifically named perils of earthquake, flood, and wind, storm, and hail, there are special deductibles. Here, Pan Am suffered flood loss, but not wind loss, at the subject properties. The subject properties are 777 Preston Street and 930 Main Street. There's another property for which Lexington did pay, where it suffered both wind and flood loss. Lexington asserts that Pan Am's flood loss is subject to the policy's deductible for wind, storm, and hail. There are two main reasons why that is incorrect. The flood deductible applies to the flood loss, and the wind storm deductible does not apply under the plain language of the policy. First, the policy says that flood loss is subject to the flood deductible, regardless of any other cause. Now, flood is actually defined, and I'd like to point out to your honors that flood is defined not just in a long list of definitions. It's defined in a special section on flood, which says that this governs flood, references to flood, and the application of flood. References and application. So it tells you how to use flood when it appears in a deductible. Now, second, and this is consistent, but it's an independent reason, the wind storm and hail deductible applies only to wind of sufficient violence to be capable of damaging the insured property. Now, wind storm, unlike flood, is not defined. And this court, like virtually every court in America, has made clear that if wind storm is not defined in a first party insurance policy, it has the meaning I just said. Wind storm refers to the insurable peril of the force of wind sufficient to damage the insured property. There are variations of that in different courts. This court noted it in SECOR, which involved Louisiana law, but there are plenty of New York and Texas and other decisions that say the same thing. Now, Lexington does not deny that. Lexington does not deny that the general rule applied by courts across America is that wind storm does not include flood, but refers rather to the force of wind, the violent force of wind sufficient to damage property ordinarily. But Lexington says that this policy is different. Even though wind storm is not defined here, Lexington says that there is a named storm provision within the wind storm and hail deductible that supposedly, quote, creates, close quote, a broader deductible than would ordinarily be indicated by the undefined term wind storm. Lexington uses that word create. There's no creation of a new deductible underneath the wind storm and hail deductible. Lexington says that there is a new deductible because the named storm provision, quote, applies regardless of the number of coverages and perils involved, expressly including flood, wind, wind gusts, and rain. Now, Lexington's partial quotation really begs the question, to what does the wind storm and hail deductible apply? And the answer is found in two places, your honors. First, you can see the answer by looking at subsection C of section 10, which is the flood deductible. It says that the following sums shall be deducted from adjusted loss due to flood. And as you saw from the provision that apply the definition of flood, what it means and how you apply it, it applies regardless of any other cost. And then subsection D, that's the top of the very section that Lexington is relying on, says the following sums shall be deducted from any adjusted loss due to wind storm and hail. What that means is that everything that follows is subject to that deductible only if you start with the premise that it's wind storm or hail. Hail is not at issue in this case, but wind storm may be. Pardon me, one sticky point I have is that flooding is explicitly, specifically incorporated into the named storm provision. Flooding is a record. What interpretive weight does that have? Well, it has interpretive weight on when you apply it to loss stemming from wind storm. So I think that the way to analyze this, Your Honor, is to look at pages 4 and 5 of our reply brief. What we did, pardon me for hitting the mic, what we did is we actually inserted the definitions into the text precisely to answer Your Honor's question. If you look at pages 4 and 5, what you'll see is that the leading language of the provision about which you asked is unaltered. It says, the following sums shall be deducted from any adjusted loss due to, and now I'm inserting the standard court-derived meaning, wind of sufficient violence to be capable of damaging the insured property and hail. And then you go on from there. So we're talking in that about that kind of loss. So if you start with the premise, as you should, that wind storm means the force of wind, then the provision to which Your Honor referred makes clear that even if there were some other loss, flood, that you would still apply this to the wind damage. The other way that you know that this doesn't just trump the flood deductible is the leading language to the flood deductible, which incorporates the anti-concurrent causation clause. Again, as I indicated, I would recommend pages 4 and 5 of our reply brief, because that says, if you insert the defined term, the following sums shall be deducted from any adjusted loss due to flood, surface water, rising water, waves, and so on, regardless of any other cause or event contributing concurrently or in any other sequence of loss. And remember, that, regardless of clause, comes in a special provision that says, this is what flood means, and this is how you apply it. We've issued decisions in other hurricane-caused flood loss cases. And you said earlier, this policy language is different than the language we've interpreted in those other cases. Yes. Now, the district court was relying primarily on cases that said that certain hurricanes qualified as windstorm, meaning that they were fast enough wind speed so that the wind damage from them fell within the parameters of the windstorm coverage in those cases. So the district court was misapplying those cases. And let me make this crystal clear. There are two kinds of understanding of windstorm. One is how you speak every day. Is a hurricane a windstorm? The other is an insurance-specific understanding that has been followed by courts for decades. And so to say, well, yes, Katrina was a windstorm is a non-controversial proposition. And we would agree that any wind damage from Katrina would be covered by windstorm coverage, absent special definitions in a policy. That's all that those decisions were referring to. Now, there are other decisions that the Fifth Circuit has also applied regarding somewhat similar issues. I think the most noteworthy are C-Corps and Six Flags. I want to start with Six Flags, actually. It's earlier in time, and it helps explain C-Corps. Six Flags involves seven insurance policies. Six of them went one way, according to the Fifth Circuit, and one of them went another. And basically, what the Fifth Circuit says in Six Flags is you had to apply the flood provisions, not the named storm provisions, absent special instructions. On the seventh, it said it's ambiguous under that policy's language. Because there was language that said, if there is another specified peril, and the flood is actually caused by that other specified peril, then the flood provisions don't apply. So that's how Six Flags came out under the language, which is a little different from our language, but it's somewhat instructive. And then C-Corps did something different. It said there is a provision here that establishes a specific named storm peril, and it applies to not just force of wind, the typical meaning of windstorm, but to, I want to make clear, there was a separate named windstorm peril, and that applies not just to typical harms caused by windstorm, but to all the kind of atmospheric disturbances and results that can result from a named windstorm, expressly including, in that case, hurricane. So C-Corps turned on the fact that there was a specific peril that embraced both windstorm and flood. That's absent here, and you can see the absence of that here from the leading language. Well, is the fact that this Harvey was a named storm leading us down the wrong path, that is unique to Harvey, was there was no wind damage in this area, and there was no flood damage in the sense of blown water? This was purely a rainstorm. Well, for the two properties at issue in this case, Your Honor is correct. For the third property that is not at issue, there actually was some wind damage. And so both sides agreed as to that post oak property, which is not necessarily typical. We're not addressing that. We're not addressing that. Exactly, Your Honor. Here, there is just flood damage. And so that is why. And a straight rain caused flood. Yes, now it's part of Harvey. I'm not disagreeing with that. But what there isn't here, and I think Your Honor alluded to that, is there is nothing blowing against a building that is harming these two buildings. And that's why we win here. Now, the district court's opinion is not just incorrect, it's dangerous. Because all of the national flood insurance policies and many other policies say, well, we cover flood, but we exclude damage from windstorm. Now, if you were to issue a ruling affirming the district court, that would create a certain degree of chaos here. Because suddenly, you'd have hundreds of thousands or millions of policyholders who bought policies that cover flood, but by their reasoning, don't cover flood if it's caused by a windstorm, which hurricanes, colloquially speaking, are. That would be a terrible result. And it's not just FEMA policies, it's all kinds of policies that rely on this distinction that we're talking about. Now, I want to talk briefly about custom and usage, Your Honor. Let me ask you a quick question. Sure. So am I correct, neither side urges that the policy is ambiguous. You each just have your respective view that, quote, my reading of the policy is the correct one. Is that? That is incorrect, Your Honor. I want to be clear. We have argued in the alternative. And we go through the reply brief several places where we made that argument in the alternative below. That if it isn't found plainly to mean what we say it means, then it's ambiguous and there should be discovery on, we asked for two issues below, a discovery on custom and usage and discovery on the drafting. So if we determine it's ambiguous, you want us to send it back. Correct, Your Honor. And we want you to send it back even if you say we're right, because we still need to have litigation over damages. So we only move for partial summary judgment. Now, let me just say this about custom and usage. All of the cases that were cited by Lexington and cited by the district court about extrinsic evidence, those are talking about things like, what did so-and-so say? Or what did so-and-so think? Or what was the conduct of the parties before this contract was signed? We've got a policy, and we've got this language. We make our living reading and writing and figuring out what it means, even though we have two sides that negotiate documents and then they bring it here for us to tell you what you meant. But a little more structure why we go outside of all that and not just deal with the text and the language and figure it out one way or another. So the extrinsic and custom and all that, not. Well, I will answer that very briefly, because I'm out of time on this. Very briefly, Your Honor, in New York and Texas both, you look at custom and usage, unlike that other kind of stuff, to figure out whether there is ambiguity. You have to understand what the terms mean in the industry in which the contract was formed in order to interpret the contract. Why not just put it in the documents? You know, and just, you know, why not put it? You've got big league people, well-paid lawyers, and all that and so much. But you know, they negotiate these things and put all this language in there and all of that, and then show up and say, well, you know, y'all tell us what we really meant when we negotiated. It's not an adhesion contract, you know, like ordinary policyholder. You want insurance, you buy it, you pay it, and you get the language. Here we get these big ticket ones with both sides exchanging clauses and all that. Yes, Your Honor. Anyway, that was not a question. That's not a question. It was just an editorial. All right. All right. Well, thank you, Your Honor. It was just catharsis for me, OK? I may respond to it on my rebuttal. No, it's fine. I mean, we get paid to do it, you know? So I'm just saying, as a policyholder, I'm just stuck with what the insurance company tells me, you know, I've got to pay. But anyway, that's it. Come on. I was just treading water. So those who needed to get out, the room for a break could do it without interrupting your argument. All right, Mr. Dennis Shroff. Thank you, Your Honor. May it please the court, James Dennis on behalf of Lexington Insurance Company. And following up, perhaps, on Your Honor's last comments about why don't we just put it in the language and be done with it, why don't we actually look at the language and be done with this? And the language is quite straightforward. We have a deductible for windstorm and half. And it says that that's $100,000 per occurrence, except 5% of the TIV at the time of the loss at each location involved in the loss or damage arising out of a named storm. And it gives you the named storm definition, which includes a hurricane, storm named to be a hurricane, regardless of the number of coverages, locations, or perils involved, including but not limited to all flood, wind, wind gusts, storm surges, tornadoes, cyclones, hail, or rain. Now, that's it. If you have a named storm, it doesn't matter what this policy covers. It's subject to that 5% deductible, so long as you have a loss arising out of a named storm. And there's no dispute here that this loss arises out of a named storm. That. But it still has to be windstorm and hail damage. That comes under that. And how do you get past the sea immediately providing that with preceding that with the flood? Because you read the language as it is. You don't start reading the policy with an a priori conception that windstorm only means wind. The cases that we've cited, the Texas Supreme Court, New York courts, they all say that how do you interpret policies? How do you interpret contracts? You start with the words that the people used. You cannot accept a hurricane and flood from windstorm and hail unless it's in there to begin with. That's how you read it. Well, there are some windstorm and hail that accompany flood, and there are other where the flood is not accompanied by that. That, in fact, is true, Your Honor. But that only means that you cannot a priori say that windstorm never means flood. Maybe it does. Maybe it doesn't. That was the holding of the Texas Court of Appeals back in 1946 when they were asked, well, what does windstorm mean? And the judge said, well, maybe it could have flood associated. Maybe it couldn't. And he talked about windstorms in East Texas could be associated with heavy rain. And he's right. We happen to be at issue here in East Texas, and it teemed during Harvey. So the issue about what does it say is clear. Plus, if windstorm and hail only mean wind, why then would the name storm deductible go on about wind and wind gusts? So if this is a deductible that applies only to windstorm and hail, why would it say that it applies regardless of all the coverages or perils involved, including wind? So we have a wind deductible that applies regardless of whether it's wind. That doesn't make any sense, and that's not how we read contracts. Don't read contracts to not make sense. So the point then, basically, is that you start by reading the contract. And what this deductible says is that name storm is basically a subset of windstorm. It's a windstorm of a particular type. And what name storm does is that it gathers together all the coverages and perils, and it says you get a 5% deductible for that. Now, Mr. Weisbrod talked a bit about this regardless of language. And regardless of language in the flood definition really does not butt up against the regardless language in the name storm deductible. The regardless of language in the flood deductible is a causation issue. It's an anti-concurrent causation clause, which this court has seen many times before. And what it talks about is that it takes flood, creates a little flood box, and it says regardless of what it is that caused flood, goes in the flood box. OK, that goes in the flood box. But the regardless of language in the name storm deductible is not operating at that level. It operates a level above that. It says, OK, now we've got all these little boxes. You've got flood, and wind, and wind gusts, and rain. What do you do with all those little boxes? All those little boxes together get a 5% TIV deductible. So there's no conflict there. They're not operating against each other. They actually operate rather well together. Now, this is not new language to this court. This court saw almost identical language in C-Corps, which involved wind, and rain, and flooding. It had all three. There was a question about C-Corps, S-C-A-C-O-R. And that was a case that involved hurricane damage from Hurricanes Katrina and Rita. And the damage in C-Corps was three types. There was wind damage. There was wind-driven water damage. And then there was just plain old rain. And the question in that case, as in this case, was, well, what's the deductible that applies? And the court went through the analysis of the deductible language, the name storm deductible language in C-Corps, which was structurally identical. Not close, structurally identical with the name storm deductible in this case. And in C-Corps, the name storm deductible started off with, in respect of loss caused directly by the peril of windstorm, as defined, there was a $25,000 deductible, except in respect of loss caused directly by the peril of name windstorm. There was a 3% TIV for all coverages combined. So basically, it's identical. It's certainly functionally identical. Now, Pan Am goes and makes an extended argument that, well, C-Corps went off on the issue of there was a separate name windstorm peril. That would be an interesting argument if, in fact, the decision reflected that in any fashion. It does not. What the Fifth Circuit did in C-Corps was to look at the definition of named windstorm. And then the question is, because the exact same issue was raised, in C-Corps, the insurance company, Commonwealth, said, no, no, no. The flood deductible applies to flood. And the name windstorm deductible applies to wind damage. And the Fifth Circuit looked at that definition. And they even said, they wrote in their opinion, they said, normally, the word windstorm by itself means a wind of sufficient strength to cause damage. But the court then went on to say, but wait a second. This policy also has this other language in it, identical to ours. And they said, you cannot then just stop at windstorm. You have to understand how that word is used in the context of this policy with regard to named windstorm. And in C-Corps, the court held that a named windstorm deductible, just like this one, applied to flood. To flood. And so this case. But wasn't there also windstorm damage in addition to flood damage? There most certainly was, Your Honor. And there wasn't here. There was, to the one building, 4,600 post oak. And we're not talking about that. It's not an issue on this appeal. But this brings us to a related issue, which is this. The named storm, the deductible provision in our policy says that if two or more deductibles in this policy apply to a single occurrence, the total to be deductible will not exceed the largest deductible applicable. Now in this case, the flood, the named storm deductible is. That's your anti-stacking? Yes, Your Honor. And it doesn't apply here, does it? Well, it goes on occurrence. Goes on occurrence. Doesn't go on how many buildings have been included in this lawsuit or another lawsuit. Goes on occurrence. Nobody's argued, in this case, there are multiple occurrences. So the fact that there was windstorm damage at 4,600 post oak road has a bit more significance than an extraneous fact. Because if, in fact, there is windstorm damage, then under 10b, under the two or more deductible language, that defaults you to the named storm deductible. Counsel talked a bit about six flags. The issue, the main issue, or one of the issues in six flags was what sublimate applied. In six flags, however, and it's a lesser part of the decision, but it is there, they applied the named storm deductible to flood loss. They applied the 3% TIV to flood loss, even though it was flood damage. So the fact that it's flood damage, the fact that in this case, it's just flood and not wind is not dispositive. Because the named storm deductible tells you that regardless of how many you have or how few you have, if you have them and it arises out of a named storm, then you get the named storm deductible. Now, counsel spoke for a few minutes about custom and usage. And there was much made in the briefing with regard to the evidence submitted by Mr. Fay. And Mr. Fay submitted a declaration. The main problem with Mr. Fay's declaration and the main problem with the entire custom and usage argument here is that you cannot use custom and usage to contradict exactly what the contract says. And counsel tries to get around that argument by saying that, well, there are really two types of extrinsic evidence. There's custom and practice or custom and usage. And then there's the kind of extrinsic evidence about what people said when they were negotiating the contract. And he said that the cases that we cite don't really deal with custom and usage. That's incorrect. The URI case that we cited from the Texas Supreme Court, the CBI case that we cited from the Texas Supreme Court, First Bank v. Brumman, Texas Supreme Court, all of them discuss explicitly custom and practice and that you do not go to custom and practice when the policy or the contract is clear and unambiguous to begin with. In Dynergy, another case that we cited, the court said experts have a proper role, but it is not to supply parole evidence or vary or contradict unambiguous contracts. Now, there's nothing that's ambiguous about the name Windstorm deductible. I listened to counsel's argument this morning. I didn't hear anything to that effect. When you look at the name Windstorm deductible, and now we've had four, actually five judges look at this language, the district courts in both this case and C-Corp, the Fifth Circuit and C-Corp, and now this panel. No one, no judge has looked at that language and said that it's ambiguous. So if it's not ambiguous and you apply it to the facts and it results in an answer, that's it. That's the end. There's no extrinsic evidence that comes into play or anything along those lines, regardless of what type of extrinsic evidence that it is. And then with regard to the two or more deductible language, the policy tells you that if there are two or more deductibles that apply to a single occurrence, the one to be used is the one that results in a higher amount, the larger deductible. That's the one that you apply. In this case, there's an argument that the flood deductible applies. Clearly, the name storm deductible applies on its face. So therefore, at best, you've got two or more deductibles. And so at that point, you then default to 10B, the two or more deductible language. And that answers the question. It obviates this issue of does one deductible clash with the other deductible. The answer is you just look at the one that's bigger. And that's it. And so that really is, in a sense, it. Now, the reason why the flood deductible does not apply, quite frankly, is this. Flood deductible tells you what applies to a flood. That's good. But then you've got the name storm deductible, which tells you what do you do with the name storm. It's a specific piece of language that tells you what you do in the particular instance of a name storm. Now, the flood deductible under this policy applies with regard to a flood that does not involve loss that arises out of a name storm. Once you get the loss that arises out of a name storm, you then go to the name storm deductible. That's another straightforward answer. Now, at the end of the day, the name storm deductible operates as a gathering clause. It just brings together everything into one place. And it says that if you have any loss, if you have, and that involves any peril, you get the name storm deductible as long as you have loss or damage arising out of a name storm. It's not a matter of whether or not name storm is a separately defined peril or not. It's just the language that's right there. And it's the language, when you read it, it gives you the answer to the question. So unless the court has any other questions, I would conclude my remarks. All right. Thank you, sir. Thank you. Back to you, Mr. Weisbord, on the phone. Thank you, Your Honor. I agree with Mr. Dennis on one point. The court should actually read the policy and go from there. And if the court does that, we clearly will win. Lexington cannot rewrite the policy to include a name storm deductible, a phrase sprinkled throughout the argument and the briefs, when that just isn't written in the policy. Now, what Mr. Dennis refers to as that name storm deductible is actually just a provision. But as Judge Wiener observed, you start with the lead-in language. And the lead-in language includes an undefined term, windstorm. And when windstorm is not defined under the laws of New York, Texas, and every Fifth Circuit case that has addressed it, it means force of wind. Now, Mr. Dennis made an interesting, totally incorrect argument when he was urging you to read the policy. He said, look at 10b. He said that that provision tells you to apply the largest applicable deductible. Well, two things are in order. First, it doesn't say that. And second, it doesn't tell you which deductibles are applicable. Maybe the second point is more important than the first. But here's what it says. If you find it too tedious to actually look at the policy for this, I will read it aloud. If two or more deductibles provided in this policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable. That doesn't say you apply the largest applicable deductible. It says the total will not exceed it. And it is not saying at all that you must apply the windstorm deductible when there's only flood. Now, again, I would urge the court to look at pages 4 and 5 of the reply brief to see how wrong this exegesis was of these provisions. When you insert the actual definitions, you will see that nothing says in the named storm provision that it applies to any adjusted loss due to named storm or to flood due to named storm. That's what you typically see in a named storm deductible, that it applies to any adjusted loss due to named storm or due to flood from a named storm. That's actually what it said in Wakefern, a policy, a case involving their own policy. That's what something suggested in Six Flags for the Commonwealth Policy. It doesn't say that here. And then Mr. Dennis also tried to distinguish the regardless of loss language in the opening sentence delete in language for the flood deductible. And he says, well, that involves causation, not applicability of provisions. But actually, the flood definition section says this tells you what the word refers to and how it's applied. And it does not say that such and such is treated as flood regardless of any cause or event except named storm. It says that it applies regardless of any other cause or event. Mr. Dennis says we've, to a degree, already gone down this road because the language in C-Corp was, quote, structurally identical to the language here. Structurally, the C-Corp policy was profoundly different because the C-Corp policy had a windstorm deductible, which the court said incorporated the common law meaning of windstorm. It had a named storm deductible, which incorporated a special definition that said this applies to all loss from named storm, including expressly hurricanes. And then it had a flood deductible. And so the court in C-Corp found that that middle one, the named storm deductible, because it expressly included all loss, not just due to windstorm, but due to hurricanes, that it applied. That's totally different from what we have here. What we have here is what you would have if, in C-Corp, that deductible didn't exist. But instead, somebody increased the windstorm deductible above it in the event that the windstorm loss occurred from a hurricane. Let me ask you one. Looking at the policy, it says deductibles A is $100,000. Yes. Then it gives three types of deductibles. One is B, earthquake. C is flood. And D is windstorm and hail. There's no question that all of the damage of the two properties we're doing is from flood. 100% flood. 100% flood, Your Honor. So why should we ever get to D, windstorm, and hail? We should not. You are absolutely right. Thank you, Your Honor. All right. Thank you, counsel, both sides, for your briefing and argument in the case. It will be submitted along with the others.